UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,      : 22-mj-01047(RER)
                               :
                               :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
DARNELL BURGESS,               :
                               : October 11, 2022
              Defendants       : 3:06 p.m.
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**


**For the Government**:         **Breon S. Peace, Esq.**
                               United States Attorney


                        BY:    **Kaitlin McTague, Esq.**
                               Assistant U.S. Attorney
                               271 Cadman Plaza East
                               Brooklyn, New York 11201



**For the Defendant**:          **Kannan Sundaram, Esq.**
                               Federal Defenders of New York
                               One Pierrepont Plaza, 16th Fl.
                               Brooklyn, NY 11201



**Transcription Service**:      **Transcriptions Plus II, Inc.**
                               61 Beatrice Avenue
                               West Islip, New York 11795
                               RL.Transcriptions2@gmail.com




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  Criminal Cause for an Arraignment.

2   It's 22-mj-1047, *United States v. Darnell Burgess*.

3          Counsel, state your appearances, please,

4   starting with the government.

5          MS. McTAGUE:  Thank you.  Good afternoon, your

6   Honor.  Kaitlin McTague for the government.

7          MR. SUNDARAM:  For Darnell Burgess, Kannan

8   Sundaram, Federal Defenders of New York accompanied by

9   Mia Halsey who's a social worker intern that's working

10  for us.  Good afternoon.

11         THE COURT:  The purpose of the proceeding today

12  is to make sure you understand your rights and what

13  you're being charged with, and to determine whether you

14  should be released on bail or held in jail.

15         You have the right to remain silent.  You're

16  not required to make any statements.  If you've made any

17  statements, you don't need to make any more.  If you

18  start to make a statement, you can stop at any time.  Any

19  statements you do make can be used against you.

20         You have the right to an attorney.  If you

21  can't afford one, the Court will appoint an attorney to

22  represent you.

23         I see from your financial affidavit that you

24  qualify to be appointed counsel, so the Court will

25  appoint Mr. Sundaram and the Federal Defenders of New

3

Proceedings

1  York to represent you.

2          You have been charged in a complaint with

3  transporting and receiving and attempting to transport

4  and receive an explosive that is black powder with the

5  knowledge and intent that it will be used to kill,

6  injure, and intimidate any individual and unlawfully

7  damage and destroy a building and other property.

8          You're also charged with using the internet to

9  willfully make a threat to injure, kill, or intimidate

10  one or more witnesses.  There are three Jane Does.  And

11  unlawfully to damage and destroy a building and other

12  property.

13          Did you receive a copy of the complaint?

14          THE DEFENDANT:  I have.  Yes, ma'am.

15          THE COURT:  Did you have a chance to talk to

16  your lawyer about it?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Do you understand what you're being

19  charged with?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  All right.  Mr. Sundaram, did you

22  discuss a preliminary hearing with your client?

23          MR. SUNDARAM:  Yes, your Honor.  Mr. Burgess is

24  going to waive a preliminary hearing.

25          THE COURT:  All right.  Thank you.  Let me take

4

Proceedings

1   this opportunity to remind the prosecution pursuant to

2   Federal Rule of Criminal Procedure 5(f) of its

3   obligations under *Brady v. Maryland* and its progeny to

4   disclose to the defense all information whether

5   admissible or not that is favorable to the defendant

6   material either to guilt or to punishment and known to

7   the prosecution.  The prosecution must make good faith

8   efforts to disclose such information to the defense as

9   soon as reasonably possible.

10          I will be entering a written order that more

11  fully describing this obligation and the possible

12  consequences of failing to meet it and I direct the

13  prosecution to review and comply with that order.

14          Ms. McTague, does the prosecution confirm that

15  it understands its obligations and will fulfill them?

16          MS. McTAGUE:  Yes, your Honor.

17          THE COURT:  All right.  Thank you.  So Mr.

18  Sundaram, what would you like to do?  Well actually, let

19  me ask is the government seeking detention in this case?

20          MS.  McTAGUE:  Yes, your Honor, and we are in

21  agreement with Pretrial Services that the defendant

22  should be detained.

23          THE COURT:  All right.  And Mr. Sundaram, I

24  understand you oppose this?

25          MR. SUNDARAM:  That's correct.

5

Proceedings

1          THE COURT:  Okay.  I had heard that there was

2   some material some party wanted me to review and so --

3          MR. SUNDARAM:  Yes.

4          THE COURT:  -- I'm happy to look at it, I just

5   don't know what it is.

6          MR. SUNDARAM:  Okay.  So I'd like to just give

7   you a summary of that.  And I obviously, you know, it's

8   up to the Court whether you want to review the material.

9   But I'll tell you what it is and why I think it would be

10  useful in whatever determination you make for you to

11  review the material.  I can summarize it.

12          Essentially, and this isn't evident from the

13  complaint but Mr. Burgess was sent from -- so he was

14  living in the shelter described in the complaint in the

15  spring.  We don't have the exact time frame, but at the

16  time of the alleged conduct.  Subsequently was

17  transferred to a different shelter which is -- I think

18  the acronym is JAMS, but it's at 3600 Jerome Avenue in

19  the Bronx.  And there's a program affiliated with that

20  shelter called Bronx Works.  Mr. Burgess has a social

21  worker there.  And what happens to him and where he's

22  placed is all governed by Department of Homeless

23  Services, DHS, the state organization.

24          So essentially based in large part on the same

25  information or allegations that are recited in the

6

Proceedings

1   complaint at least with respect to the bomb making

2   equipment, Mr. Burgess was transferred to a different

3   shelter.  He was hospitalized twice.  And most recently

4   he was hospitalized from September 23rd until the

5   present.  And then what happened is I think the marshals

6   or federal law enforcement arrested him yesterday as he

7   was released from the hospital.  So he was really

8   actually released and they took custody of him and took

9   him to the MDC.

10          But what's been happening since his admission

11  to Montefiore Hospital on September 23rd is -- and the

12  Court may already have familiarity with this, I don't

13  know if you do.  I have some familiarity with the New

14  York mental hygiene law  but there are some procedures

15  that have to take place in the Supreme Court on the

16  question of whether somebody should continue to be

17  hospitalized or whether they should be released and under

18  what conditions.  And that process has been underway.

19  And Mr. Burgess was represented, as people are in these

20  situations, by Mental Health Legal Services which I think

21  is a state organization that gets appointed to represent

22  the respondent.  There's no criminal charges in state

23  court so he's a respondent.  Although they also get

24  involved when there's a criminal charge in state court.

25          And also involved in this process is counsel

7

Proceedings

1  for Montefiore Hospital as well as the treating physician

2  herself.  So affirmations were filed by both and all of

3  this information was presented to a Supreme Court judge

4  in the Bronx.

5           And the upshot of it is that they presented an

6  order to show cause under the mental hygiene law  why he

7  should not be placed in what's called assisted outpatient

8  treatment.  And so that's a very regimented setup which

9  as explained in the filings is to be used in situations

10 where somebody has been cleared by the treating

11 physicians and the people treating him to no longer be in

12 inpatient treatment because he's been stabilized.  That's

13 all reported in affidavits of the MD who's been treating

14 him.  But somebody who, due to his mental illness and the

15 risk of decompensation, can't be necessarily relied on by

16 himself without some further measures in place to stay on

17 his medications and to go to treatment.

18          So the result of this is a very detailed

19 treatment plan for AOT, assisted outpatient treatment,

20 was presented to the judge with the endorsement of the

21 physicians, medical personnel, and the counsel for

22 Montefiore Hospital.  And then in that process, Mr.

23 Burgess was represented by Mental Health Services.  So in

24 the brief time we've had today, my paralegal assistant

25 was able to talk to one of their lawyers.  The ones who

8

Proceedings

1  actually dealt with this case on the ground were not
2  available but they were able to send us papers as was
3  counsel for the hospital.

4          So the judge ordered that a video conference be
5  ordered for October 12th, which is tomorrow, at 10 a.m.
6  for some sort of hearing on this.  And you know, my
7  belief after speaking to various parties including the
8  people who'd would be supervising him if the AOT is
9  ordered is that the expectation is that that will be
10  ordered by the judge.  I don't think it's opposed by any
11  of the parties.  And if that is ordered, then Mr. Burgess
12  would be under the care and supervision of various people
13  which are listed in paragraph 9 of this filing but they
14  include a -- I'm sorry, I don't know what this acronym is
15  for but it's IMT, and I just got off the phone with them,
16  an IMT program.  There's a caseworker for that.  They
17  have all the contact information for the director of the
18  program, the social workers.  There's a psychiatric
19  treatment medication management aspect of the program.
20  There's random blood screening and urinalysis.  And he'd
21  continue under the current medications which include
22  Abilify, Abilify Maintena, Depakote and Cogentin with the
23  option of switching to or adding Risperdal Consta and
24  Invega Sustenna.  This is all in the report.

25          And we would submit that under the Bail Reform

9

Proceedings

1  Act, especially on the component of danger to the

2  community, if he's allowed to go through this process and

3  be ordered into this treatment regimen, that would

4  provide a reasonable assurance that is not a danger to

5  the community especially given that he's been compliant

6  with his medication while in the hospital.  And according

7  to his treating physician who said she'd be willing to

8  testify at least at that hearing, he is currently stable

9  and will remain stable as long as he stays on his

10 medications and goes to the treatment.  And this now

11 would be ordered by a state court judge.

12        So I would propose that Mr. Burgess be released

13 with the condition, the bond condition, that he comply

14 with any order under the mental hygiene law  or however

15 that would be phrased.  Any state court order regarding

16 his treatment and that he would also be on an ankle

17 monitor, location monitoring so that Pretrial could know

18 that he's going to his treatment.

19        The person who we would propose to sign the

20 bond would be my client's father who did speak to

21 Pretrial and I think is a viable suretor.  He's not

22 available in person today.

23        So what I would request is that the Court, I've

24 made a copy, take a look at the filing, the order.  It's

25 about 20 pages but it's mostly -- some of it is

Proceedings

1   repetitive and it has affirmations by the physician and

2   by counsel for the hospital.  And I'll provide a copy to

3   the government and I would ask for a second call.

4          THE COURT:  Mr. Sundaram, your client is

5   raising his hand so I don't know if you want to -- talk

6   to your lawyer first.

7                 (Pause in proceedings)

8          MR. SUNDARAM:  He just wanted to let you know

9   because that's what I talked to him about after I got

10   these -- I got these just a little bit before I was able

11   to come to court and I reviewed it and he has affirmed

12   that he already has talked about this with his lawyers

13   and with his physician and he was very much willing and

14   interested in doing this.

15          THE COURT:  All right.  And you said you have

16   not provided a copy to the government?

17          MR. SUNDARAM:  I discussed the contents with

18   the government but my understanding is that they're going

19   to oppose --

20          MS. McTAGUE:  I can speak to that, your Honor.

21          THE COURT:  It was a simple question of whether

22   you received a copy.

23          MR. SUNDARAM:  No, no.  Yeah, I didn't give

24   them a copy.

25          THE COURT:  No.  Okay.  So Ms. McTague, go

11

                              Proceedings

1    ahead.

2              MS. McTAGUE:  Yes, your Honor.  You know, I

3    just want to make it clear that this was a sealed

4    complaint that at the time that the mental health order

5    that counsel is discussing, none of the facts or

6    allegations contained in the complaint were public.  And

7    so any decisions or orders that were made were absent

8    these new allegations.

9              Now, in their conversation that I had with

10   counsel before this particular proceeding, he indicated

11   that there was a notation in the order that stated that

12   an NYPD officer that was not specified to my knowledge

13   indicated that they had been aware that the defendant was

14   searching for bomb making materials but nowhere in the

15   report was I directed to a place where it had any

16   specific notations as to exact materials that the

17   defendant was looking for as is listed in the complaint,

18   nor any of the threats made to any of the three Jane

19   Does.

20             So the fact is that there was this mental

21   health order that counsel is discussing but that doesn't

22   take into account any of the new charges that the

23   defendant is facing.

24             And so I just would hesitate to let the

25   defendant go based upon an order that very well may not

12

Proceedings

1    have been granted had they known of these new charges or

2    these new threats that the defendant was making.

3              THE COURT:  All right.  So let me just try to

4    unpack what you're all saying.

5              So the government is seeking detention.  Let me

6    just start there.

7              MS. McTAGUE:  That's correct.

8              THE COURT:  On what basis?

9              MS. McTAGUE:  On the facts contained in the

10   complaint, the defendant's history of making terroristic

11   threats, I believe that was the initial charge in Nassau

12   County, and it was pled to the aggravated harassment over

13   the phone, threats made over the phone, and the

14   conclusions made by Pretrial Services, your Honor.

15             THE COURT:  I'm asking for the legal basis.

16   Under the Bail Reform Act there are specific

17   considerations that need to be taken into account.  So

18   can you start there?

19             MS. McTAGUE:  Your Honor, I have to say I'm

20   covering this for someone but my understanding is they

21   were relying upon the facts in the complaint and the --

22             THE COURT:  I understand the facts in the

23   complaint.

24             MS. McTAGUE:  -- and the threats made to the

25   victims.

13

Proceedings

1          THE COURT:  So which provision?  Is this a
2    presumption case?

3          MS. McTAGUE:  I'm sorry, your Honor?

4          THE COURT:  Is this a presumption case?

5          MS. McTAGUE:  I am unaware at this time, your
6    Honor.

7          THE COURT:  And is this based on danger to the
8    community?

9          MS. McTAGUE:  It is, your Honor.

10         THE COURT:  And is it under 3142(f)(1) or
11   (f)(2)?

12         MS. McTAGUE:  Just a moment, please.

13         THE COURT:  All right.  So I mean maybe what we
14   can do is take a break.  You can work out what the
15   government's position is, not just the facts, but the
16   legal basis, how I should be analyzing this.

17         And then also, Mr. Sundaram, if you can share
18   the copy of the report with Ms. McTague?  I also would
19   like to know more about what this proceeding is because
20   it sounds like it's a proceeding where your client
21   required mental health services and the doctors say he no
22   longer needed to be in the hospital, but if he's in the
23   community he's going to need assistance to stay on his
24   medication and things like that.  And this order is to
25   provide him that assistance?  The order that may happen

14

Proceedings

1   tomorrow?  Was that what you're saying?

2              MR. SUNDARAM:  That's correct.  The order

3   would -- so for assistant outpatient treatment, which is

4   specifically something that is under the mental hygiene

5   law --

6              THE COURT:  Right.  But that doesn't --

7              MR. SUNDARAM:  -- it has to be court ordered.

8              THE COURT:  Right.  But it doesn't speak to any

9   danger to the community which is a criminal law analysis.

10  So what you're saying is in order to address what the

11  government seems to be saying which is that your client

12  poses a danger to the community, you're saying that this

13  assisted outpatient treatment provides enough structure

14  and assurance so that the community will be protected,

15  the community and the three purported victims in this

16  case would be protected from your client.  Is that what

17  you're saying?

18              In other words, the program is meant to create

19  conditions that will assure the safety of the community.

20              MR. SUNDARAM:  The program is designed to do

21  that.

22              THE COURT:  Well it's not designed to do that.

23  The program is designed to treat the patients, right?

24  Because it's a health issue?

25              MR. SUNDARAM:  It's designed to do both because

Proceedings

1   under the mental hygiene law he could -- these conditions

2   are actually satisfied for him to -- the judge would have

3   to make a finding that he can safely be in the community.

4   And I'll show you what it says here.

5          THE COURT:  Can we then back up.  Why was he in

6   the hospital in the first place?

7          MR. SUNDARAM:  He was hospitalized because of

8   in part because of the conduct that was alleged in this

9   case.  Now, they didn't have access to the federal

10  complaint obviously.  The shelter apparently itself

11  reported --

12         THE COURT:  I see.

13         MR. SUNDARAM:  -- that he had received bomb

14  making equipment.  So that's what precipitated him.  And

15  then there was a suicide attempt reported in September.

16  Those precipitated him being placed at Montefiore for

17  treatment.  And then he was treated continuously.  And

18  according to the doctor he's now stable and he's

19  stabilized.  And they're concerned about him

20  decompensating.  And they said to prevent that they're

21  putting this in place.

22         But under the mental hygiene law, one of the

23  things that the Court has to find is that the patient,

24  that assisted outpatient treatment is in order to prevent

25  a relapse or deterioration of his present mental status

16

Proceedings

1   which would be likely to result in serious harm to the

2   patient or others under Section 9.01 of the mental

3   hygiene law.  I didn't have time to pull that but I will

4   have that prepared for when we reconvene.

5          But essentially they do have a danger

6   component, a danger to himself or others and that

7   includes physical danger.  So it's not exactly the same

8   as the Bail Reform Act but there's some overlap.

9          THE COURT:  Right.  But you're not saying that

10  that court -- what you're trying to say is that the

11  conditions that the Court may impose in that situation

12  may be sufficient to address the danger to the community

13  in this case.

14         MR. SUNDARAM:  Yes.  And certainly at the

15  minimum what I'm saying is that with those -- and I'm not

16  asking this Court to defer to that court's finding.  I'm

17  just saying that that court is making a finding that does

18  address danger under that statute and that the

19  protections that we had placed and the evidence presented

20  by the physician treating him I think should lead to the

21  conclusion along with Pretrial Services monitoring and

22  ankle monitoring that that bond signed by his father

23  would reasonably assure against the danger under the Bail

24  Reform Act.

25         THE COURT:  Right.  But I don't yet know what

17

Proceedings

1   conditions that court -- number one, I don't know if the

2   Court is in fact going to impose those conditions.

3          Number two, I don't know what those conditions

4   are if the Court were to issue an order because the order

5   hasn't been issued yet.

6          Number three, I don't know if in the course of

7   that hearing anyone is going to bring up this federal

8   charge and the facts here because I don't know, as Ms.

9   McTague brought up, it's not clear whether that court, if

10  what you're saying is true, that -- if that court is also

11  looking at danger to the community.  Certainly if there

12  are new facts now in the unsealed complaint that the

13  Court needs to know, that may play a role in whether the

14  Court issues the order and if so, for what those

15  conditions are.

16         So at the moment, I am being asked to make a

17  decision in the absence of a lot of information.  That's

18  what I'm a little bit unsure about.

19         And I also don't know who's going to

20  participate tomorrow and how that information, the full

21  information will be given to the Court.  Your client

22  keeps raising his hand, so I don't know, Mr. Sundaram, if

23  you need to talk to him.

24         MS. McTAGUE:  Your Honor, I just have some

25  information to add --

18

Proceedings

1        MR. SUNDARAM:  I was advised that he just talk

2   to me for the --

3        MS. McTAGUE: -- that I just received.  Thank

4   you.

5                (Pause in proceedings)

6        MR. SUNDARAM:  Your Honor, in case this wasn't

7   clear to you, my client is also just letting me know that

8   the treatment that's envisioned by the AOT has already

9   been put into place for now.

10        I do understand the Court's questions and I

11   will endeavor to find out.  You know, I've been also just

12   doing this under a short time frame and with the goal of

13   preventing him from going to the MDC where I feel like

14   that would be the worst step towards ensuring his

15   decompensation especially with the hearing that's going

16   to happen as early as tomorrow morning.  But I will try

17   to find out if the hearing -- I'll try to find out what I

18   can about the likelihood that AOT will be put into place

19   or if it can be put in place and also whether there's

20   some vehicle for getting the additional information in

21   front of the judge and whether the hearing can proceed

22   without him.

23        THE COURT:  Or can it proceed from MDC?  I know

24   the MDC has video capacity but I don't know whether that

25   counts as a court proceeding that they would be able to

19

Proceedings

1    join.  Again, Mr. Sundaram, your client's raising his

2    hand.

3              THE DEFENDANT:  (Inaudible).

4              THE COURT:  You should talk to your lawyer

5    first.  I don't want you to address me directly until you

6    check with your lawyer.

7              Ms. McTague, let me hear from you.  You said

8    you had information.

9              MS. McTAGUE:  Yes.  Thank you.  I've spoken

10   with one of the case agents and she indicated that the

11   allegations for which the mental health order that

12   counsel is discussing is concerning is regards to an

13   allegation that the defendant made, threats against the

14   shelter that he was staying, and that specifically he was

15   threatening to shoot up the shelter.  That is separate

16   and apart from the charges in the new complaint before

17   your Honor.

18             THE COURT:  Okay.  I mean I don't think whether

19   the court in the health proceeding issues the order or

20   not is going to be dispositive here.  I would need to

21   know what the conditions are so that I can make an

22   assessment whether those conditions are sufficient to

23   ensure the safety of the community including the

24   individuals here.

25             And I'll just take a pause here.  Do the

20

Proceedings

1   victims know this proceeding is happening and did they

2   want to participate or weigh in at all?

3           MS. McTAGUE:  They are aware that this is

4   ongoing, your Honor, and I believe my information is that

5   they are willing participants in this.

6           THE COURT:  They are willing what?

7           MS. McTAGUE:  They're fully participating in

8   this prosecution.

9           THE COURT:  Right.  But they don't have

10  anything to say about bail?

11          MS. McTAGUE:  I mean your Honor, based upon the

12  conduct alleged in the information that I have from the

13  agent beside me that they would like him to be detained

14  as would defendant's brother as in the Pretrial Services

15  report.

16          THE COURT:  All right.  So Mr. Sundaram, I'm

17  willing to consider what you have.  I hesitate to release

18  your client today because I don't know what the

19  conditions are that would otherwise be available to treat

20  him.  I'm unclear how the hospital released him knowing

21  that he might still need assistance.  So in other words,

22  if he had not been arrested would he have just gone back

23  to the shelter without anybody checking in on his

24  medications?  I am --

25          MR. SUNDARAM:  Well no, I think that the AOT

21

Proceedings

1   was already provisionally in place.

2           THE COURT:  It was provisionally in place.

3           MR. SUNDARAM:  I can still -- those are things

4   I'll --

5           THE COURT:  Okay.  So if it's provisionally in

6   place, I would like to know what happens if I release him

7   today.

8           MR. SUNDARAM:  Of course.

9           THE COURT:  Right?  So what is happening

10  between now and the hearing and if the hearing is granted

11  what will happen?  If the order issues as a result of the

12  hearing, what happens?  And if it's denied, what happens?

13  If it's denied, does he go back to the hospital or is he

14  then free to go about his life without any assistance to

15  address his mental health issues?  I'm not familiar with

16  that system.  And so I have to then weigh all that

17  information against what has been alleged here and what

18  the government is arguing and what they will provide more

19  information on as well.  So do you think you can get that

20  information between now and 5 o'clock or --

21          MR. SUNDARAM:  Yes.

22          THE COURT:  All right.  So --

23          MR. SUNDARAM:  I do because we've been in touch

24  with some of the lawyers but some of that happened while

25  I was here.

22

Proceedings

1        THE COURT:  Okay.  So why don't we put this

2   down for a second call so that both sides can prepare.

3   In the meantime, if you can provide a copy of the papers

4   that you want the Court to consider to the AUSA and then

5   also give a copy to me, I'll take a look at it as well.

6   So we'll say about a half hour but if you're ready before

7   then, let me know.  And if you need a little more time

8   also let Michelle know.  All right?

9        MR. SUNDARAM:  So you're looking at 4 o'clock?

10        THE COURT:  Around 4 o'clock.

11                 (Off the record)

12        THE CLERK:  Okay.  So we have a second call for

13   22-mj-1047, *United States v. Darnell Burgess*.

14        Counsel, state your appearances please starting

15   with the government.

16        MS. McTAGUE:  Good afternoon again.  Kaitlin

17   McTague for the government.

18        MR. SUNDARAM:  Kannan Sundaram, Federal

19   Defenders for Mr. Burgess accompanied by Mia Halsey, a

20   social work intern.

21        THE COURT:  All right.

22        MR. SUNDARAM:  Your Honor, in the courtroom as

23   well is Danielle Azzarelli.  She's one of our social

24   workers.

25        THE COURT:  Okay.  So I have reviewed this

23

Proceedings

1   order to show cause with regard to the proceeding in

2   state court under the mental hygiene law.  Let me hear

3   from the government if they have any further argument to

4   make on this point.

5        MS. McTAGUE:  Yes, your Honor.  First, just

6   taking a step back, the government is seeking detention

7   primarily based upon the dangerousness of the defendant

8   not only to the identified individuals in the complaint,

9   Jane Does 1, 2, and 3, all of whom I believe are known to

10  the defendant.  And he specifically made threats to them

11  because of prior interactions with them.  But also to the

12  community at large.

13       Now, as you can see in the complaint, your

14  Honor, there's not only screenshots of the specific

15  complaints, excuse me, specific threats that the

16  defendant made to individuals but also there are

17  photographs of the items that the defendant purchased on

18  Amazon and other internet retailers which are items and

19  materials used to make a bomb.

20       In addition to that, as specified in the

21  complaint, your Honor, the defendant has looked up in his

22  internet search history how to make a bomb, murder

23  charges in New York State, what do they use to make a

24  barrel gun, major components of a firearm.  This is in

25  section paragraph 6, your Honor.  Bulletproof cars,

24

Proceedings

1  police killings in New York, Ted Bundy, thermobaric bombs

2  versus nuclear bombs, and where can I buy potassium

3  nitrate in New York?  And there are photographs of the

4  purchases the defendant made.

5          So the people are seeking detention not only as

6  to the defendant's dangerousness to these specific

7  individuals who are known to the government, but also to

8  the community at large because obviously these materials

9  are harmful to any multitude of people in the community.

10          Additionally, your Honor, as indicated in the

11  Pretrial Services report and as discussed in the earlier

12  proceeding today, the defendant doesn't have a central

13  home location.  He's been transient in different shelters

14  of which he has been kicked out of including the Atlantic

15  Avenue Shelter.  And I believe he is in the Jerome Avenue

16  Men's Shelter now for which he's made threats to

17  individuals there and for which he was placed into this

18  treatment facility for which the mental health order is

19  regarding.

20          To continue, your Honor, the defendant has most

21  recent to -- excuse me, beginning in April of 2022

22  throughout April and May the defendant was making threats

23  against other people in the shelter in which he was

24  staying.  He said he would shoot and kill others and

25  himself.  He threatened the director who filed aggravated

25

Proceedings

1  harassment charges which were, my information is, dropped

2  down just to a harassment complaint.  But that is what

3  dropped the defendant from the Atlantic Avenue Shelter.

4        The defendant was then hospitalized for a

5  period of time.  He was remanded.  Excuse me.  Probation

6  violated him because he didn't abide by the mental health

7  treatment conditions of his probation.

8        He was released in May of 2022 and at that time

9  is when the defendant entered the Jerome Avenue Men's

10 Shelter.  Between July and August the defendant was in

11 the Montefiore Hospital for mental health treatment.  And

12 in August of this year is when he made the threats to

13 Jane Doe.

14       So the defendant has been in and out of mental

15 health treatment, shelters, custodies, and yet he

16 continues to make threats.  So that goes to the

17 dangerousness.

18       Now, as to the defendant's risk of flight, he

19 is not employed.  He does not have a stable home.  He may

20 or may not be accepted back into a shelter given the

21 various threats that he has made to people who work in

22 the shelter.  So those are the bases that the government

23 is seeking detention.

24       Your Honor, I'm going to renew than the

25 argument that I made earlier as to just the ambiguity as

26

Proceedings

1  to whether or not the mental health order would have been

2  granted had these facts in the new complaint been

3  considered.  That's where I'll rest my argument.

4        THE COURT:  The complaint in the state court,

5  or rather the issues in the show cause order reference

6  the threats, not the ones made to the specific Jane Does,

7  but the threats and also making the bomb, the bomb

8  materials.

9        MS. McTAGUE:  Your Honor, if I may, just based

10  upon information I'm receiving from the agent, the

11  references to the bomb materials contained in the state

12  court paperwork is as to threats he made against the

13  Atlantic Avenue shelter, not the new threats against the

14  Jerome Avenue shelter.

15        THE COURT:  But since the proceeding below is

16  not a criminal court proceeding, I'm not sure why that

17  would make a difference.  The proceeding under the mental

18  health law is about the treatment of this particular

19  individual and the safety to the community so that

20  treatment for him for his own good and also to ensure the

21  safety of the community because it seems like if he's

22  taking his medications, then there isn't a threat.  And

23  so I'm not sure knowing that he made threats to other

24  individuals outside the shelter it's really that issue.

25  It's really about his compliance with the medication as I

27

Proceedings

1  read it.  But I'm still not sure, Mr. Sundaram perhaps

2  you can address this, what the evaluation or what the

3  analysis was that made the hospital release Mr. Burgess

4  given that they have all these concerns about his

5  compliance.  I don't understand how things operate at the

6  state level.

7          MR. SUNDARAM:  So since we were here earlier, I

8  did speak to one of the lawyers who is a party to this

9  litigation, the one who filed the order to show cause.  I

10  also spoke to an IMT person who is with cases which is

11  referenced in the paperwork.  They would be dealing with

12  Mr. Burgess and helping coordinate all of the services in

13  the event he gets released.  And then the AOT is ordered.

14          So from talking to the lawyer, and this is also

15  something I've encountered before is that under I think

16  Kendra's Law the civil commitment standard is what

17  governs if the person is involuntarily hospitalized.  And

18  so based on the progress during his hospitalization,

19  which I think has now been over two weeks or about two

20  weeks, since September 23rd, the medication, the therapy,

21  the treatment by the physician, it was determined that he

22  would not be, cannot be held at the hospital

23  involuntarily in his current state and so because he's

24  currently not a danger, at least under the civil standard

25  to himself or anyone else.

28

Proceedings

1        THE COURT:  Right.  So let me just stop you

2   there.  So because there's medication that will address

3   your client's behavior, the hospital determined as long

4   as he's on the medication he can safely be in the

5   community and should not be civilly committed against his

6   will.  Is that the analysis?

7        MR. SUNDARAM:  Yes.  It's because he was under

8   medication for a period of time and observation and

9   analysis and treatment as well.  And so where the AOT

10  comes in is that they can either leave people and release

11  them and then hope for the best and tell them you should

12  be doing this and this.  Or if the court orders

13  additional levels of treatment that he's required to

14  follow, which is what happened here, then that provides

15  some additional measure that is designed to prevent

16  decompensation.  And I think he could have litigated

17  this.  Like his mental health lawyers could have fought

18  against this and said we don't want an AOT to be ordered

19  by a court.  But they didn't.  Because he consulted with

20  them and he decided with their advice that he wants this.

21  And this wasn't in place previously.

22        He has been in and out of mental health

23  treatment, that's true, with cases.  But he hasn't been

24  under an AOT that was ordered by the court with all of

25  these services in place.  So that's what would be ordered

Proceedings

1    tomorrow.

2            And the lawyer also told me that since it's on

3    consent, since the AOT order is on consent of the parties

4    meaning the hospital lawyers who filed it and Mental

5    Health Legal Services, his lawyers, he expects that it

6    will be signed.  But it won't be in place officially

7    until the court orders it unless that happens which would

8    be hopefully tomorrow.

9            The lawyer explained that you can start

10   receiving the services while the AOT is pending.  That's

11   why he was already eligible for the services.

12           THE COURT:  And are you saying that the alleged

13   criminal conduct here was the result of your client's

14   mental health challenges?

15           MR. SUNDARAM:  I mean at this point, you know,

16   given the criminal case and the pending charges, all I

17   would say is that certainly seems to be the doctor's

18   conclusion that he was in a decompensated state at the

19   time of the alleged conduct and that he isn't anymore and

20   that that's why he's not -- that's why he shouldn't be

21   involuntarily hospitalized.  And that's why he can be

22   safely in the community, safely with respect to other

23   people and himself if he is under medication and

24   receiving his other services.

25           And I think they also mentioned the cannabis

30

Proceedings

1    problem.

2              THE COURT:  Okay.  And so what is your proposal

3    in terms of where your client will live?  Who will be

4    making sure he shows up to court?  The medical report in

5    the state proceeding says he reported no next of kin who

6    can help out, no place to live.  What's the plan there?

7              MR. SUNDARAM:  Well, if he were released at

8    this point, like right now, I think Ms. Azzarelli can

9    speak to this, but I think he would then have to go to a

10   central shelter and then they would figure out which

11   shelter is his assigned shelter.  Currently his assigned

12   shelter is apparently the Jerome Avenue shelter.  So DHS

13   assigns a shelter and they're required to do that.  So

14   he's entitled to a shelter.  But because he hasn't been

15   at one for a period of time, he wouldn't be able to go

16   straight back to the last one.  He would first have to be

17   released -- Ms. Azzarelli can address this.

18             MS. AZZARELLI:  I'm sorry, Judge.  I'm Danielle

19   Azzarelli, social worker.

20             Mr. Sundaram is correct in that he would go to

21   the central intake filter in Manhattan, 30th Street men's

22   shelter on First Avenue in Manhattan right by Bellevue

23   Hospital.  And at that point he can go and speak to an

24   intake counselor.  They'd pull up his file.  They'd see

25   that he has a shelter history and can explain to staff

31

Proceedings

1  there that while the Jerome Avenue shelter is a shelter

2  of record, he is not permitted to return to that

3  residence.  And then they would find him another suitable

4  residence.  New Yorkers with or without citizenship

5  status, anybody has a right to shelter in the city and

6  they cannot turn him away if he were to go to the intake

7  shelter today.

8       THE COURT:  And they couldn't turn him away

9  even if they found out he had a history of making threats

10 to prior shelters?

11      MS. AZZARELLI:  They would have to accommodate

12 his situation because of I believe it's Callahan, the

13 state law that gives the right to shelter the city.  They

14 would have to accommodate and find him eligible for

15 shelter is my understanding.

16      MR. SUNDARAM:  Your Honor, that was also

17 confirmed by the lawyer I spoke to who deals with these

18 cases and as well as the caseworker at cases who would be

19 on his IMT team is that he will be placed somewhere.  He

20 has to be under the law even -- and by the way, the IMT

21 person confirm that they were aware of the allegations

22 against the shelter at the time that he was taken to the

23 hospital.  So the people who treated him were aware of

24 that.

25      THE COURT:  So let me ask how often does Mr.

32

Proceedings

1   Burgess have to take his medication in order to have

2   everything under control?

3          MR. SUNDARAM:  So either it has to be every day

4   orally with the pill or a monthly injection and as of

5   late it's been orally.

6          THE COURT:  Okay.  But if he misses a day then

7   there's a risk that he's going to act up.  Right?

8          MR. SUNDARAM:  I mean it's not my -- I'm not a

9   doctor.  My understanding is that if he is then taking it

10  for a period of time he would have to miss it more than

11  once before -- I think it's more gradual.

12         THE COURT:  Right.  So is there any way to have

13  this newer information about threats to specific

14  individuals, not just to the shelter, relayed to the

15  people in the state proceeding to see if they still think

16  that their plan is a good one and will moderate Mr.

17  Burgess's behavior in a way that protects specific

18  individuals who have been targeted as opposed to sort of

19  general threatening behavior?

20         MR. SUNDARAM:  So that's something I'm not

21  entirely clear about.  But from talking to the lawyer

22  about the law that governs these things, I don't believe

23  that that information would come into play in this AOT

24  order because it's primarily based on the fact that he's

25  currently stable and will remain stable.  And I think

33

Proceedings

1   that -- I believe that the only way these current

2   allegations would lead him to go -- I can't say this for

3   100 percent but I don't believe they would enter into the

4   current equation.  I think that if he were -- if these

5   were brought to light even back before he was

6   hospitalized, and these allegations appear to be from

7   June, July, and August, which was six weeks before he was

8   hospitalized, if those things had been brought to light

9   then I think we'd be in the same place we are now because

10  he would have just been treated.  I mean if you compare

11  the allegations of ordering explosives to make a bomb and

12  threatening to blow up a shelter, I don't think that this

13  would appreciably change any of that.

14            I would also note that the government is citing

15  all of these things in the complaint.  All of them appear

16  to be threats on their face, threats.  None of them were

17  acted upon and months passed.  And NYPD went and talked

18  to him.  That's what he reported.  That they left a slip

19  of paper with a phone number to call the DHS person, gave

20  it to him.  He called.  He thinks that was sometime after

21  April but he doesn't remember when.  And then when he was

22  I think at the Jerome Avenue shelter, the police went to

23  the hospital where he was hospitalized before Montefiore

24  and try to talk to him there.  So you know, he was aware

25  that law enforcement was being made aware of these

34

Proceedings

1  allegations, at least some of them.  And he doesn't have

2  any (indiscernible).  He just stays in this shelter

3  system and goes to the next shelter.  So it's easy to

4  track him.  I mean he hasn't been living on the street at

5  all through this entire time.  He's been in the shelter

6  system.

7          THE COURT:  Okay.  And let me ask the

8  government you talked about ordering the bomb making

9  materials, you talked about communications by electronic

10 means, making the threats?

11         MS. McTAGUE:  Yes, your Honor.  Facebook

12 Messenger.

13         THE COURT:  Right.  And then you talked about

14 looking up certain things again electronically how to

15 make a bomb, those kinds of things?

16         MS. McTAGUE:  Yes.  And if your Honor looks

17 beginning in paragraph 3 and onto page 4, there are

18 actually items and materials that the defendant

19 successfully ordered.

20         THE COURT:  Right.  But you don't have

21 information that he assembled the bomb, right?  He

22 ordered the materials.  And you don't have information

23 that he tried to approach the individuals he was

24 threatening.

25         MS. McTAGUE:  The only information that I have

35

Proceedings

1  before me in the complaint, your Honor, is that the

2  defendant was ordering the materials in order to

3  therefore create a bomb.

4          Your Honor, if I may just add something?  The

5  defendant has been in custody since September 22nd and it

6  appears as though his stability is because he was

7  hospitalized since that time.  When the defendant, based

8  upon the timeline that I have been provided, when the

9  defendant is not under a strict -- when the defendant is

10  not basically being held and given his medications,

11  that's when he goes off of it.  So your Honor, the

12  information that I have is that he was violated on

13  probation and remanded because he didn't abide by

14  specific mental health components and that was in May of

15  2022.  So the defendant is stable now because he was just

16  hospitalized.  So he was being held and being supervised

17  when he was given his medication.

18          The defendant's history shows that when left to

19  his own devices he doesn't take his medication and then

20  this conduct persists.

21          THE COURT:  But the order below, the order to

22  show cause, and if the IMT plan I guess is what it's

23  called, or the AOT plan is ordered, then there would be a

24  healthcare professional who it sounds like would be

25  making sure that he does take his medications.  Right?

36

Proceedings

1          MS. McTAGUE:  That was part of his probation

2   that he initially violated.  So all I'm looking at is the

3   defendant's history of wavering back and forth between

4   taking his medications and not.

5          THE COURT:  I understand that.

6          MS. McTAGUE:  And when he's in a, for lack of a

7   better word, like contained environment, whether if he's

8   held in a hospital or incarcerated and can be

9   administered his medication on a regimented basis, that

10  is when it is most likely to be successful.

11         THE COURT:  And what mental health treatment

12  will Mr. Burgess get at MDC?

13         MS. McTAGUE:  I can't speak to that, your

14  Honor.

15         THE COURT:  Probably none.

16         MS. McTAGUE:  I don't know.

17         THE COURT:  But I'm going to say safely --

18         MS. McTAGUE:  I understand, your Honor.

19         THE COURT:  -- that he will not get any

20  treatment there.

21         MS. McTAGUE:  I understand.

22         THE COURT:  And when he doesn't get treatment

23  is when he acts up.  You know, this is the challenge.  I

24  mean the healthcare professionals at the hospital made

25  the assessment that with the medications Mr. Burgess can

37

Proceedings

1  safely be in the community but they did express this

2  concern that he has a history of noncompliance.  And so

3  the plan that is being proposed to be put in place is

4  some kind of plan to make sure that Mr. Burgess is taking

5  his medication and is compliant, and it's for a year.

6        I don't know what that consists of so I don't

7  know if somebody's going to check in with him every day

8  to make sure he's taking his medication.  I don't know

9  whether he's going to consent to the monthly injection so

10 that he doesn't have to take the medication every day.

11       So I understand that the healthcare folks feel

12 comfortable with this but I don't know enough about what

13 is happening, so it's a little bit hard for me to impose

14 conditions of his release.  So hold on, Mr. Burgess.  I

15 see you but let me finish.

16       So I don't think I can say -- I mean I can

17 either separately impose the condition that he take his

18 medication every day, you know, report to Pretrial

19 Services every day, for example, and take the medication

20 in front of them so they know he's taking his medication.

21 I suppose I could do that.  But I don't know if that's

22 workable.  And I don't know that I can order a healthcare

23 professional to ensure that he's taking his medication.

24       So if the order is -- and then I also have no

25 control over the order, right?  Because even if the Court

38

Proceedings

1   orders that this AOT plan be put in place, a month from

2   now they might decide that it's not workable and they

3   resend it and then I suppose at that point Pretrial

4   Services will come back and tell me that that safety net

5   is no longer available and what are we going to do about

6   it?

7          So there are just a lot of variables that give

8   me concern.  On the other hand, there's MDC.  So you

9   know, this is my dilemma.

10         Mr. Sundaram, your client wants to talk.

11              (Pause in proceedings)

12         MR. SUNDARAM:  Your Honor, I'm going to share

13  with you to you what Mr. Burgess told me which I think is

14  somewhat helpful.  But also I wanted to say that the

15  lawyers (inaudible) also told me that the service, the

16  level of service provided under this plan is what he

17  called among the highest level of services that is

18  available.  Not the very highest level but it's among the

19  highest level.  And also that it does call upon his

20  intensive mobile treatment, the IMT people, to check on

21  him.  I don't know the frequency is every day.  I'm sure

22  it's more than once a week though that they will check on

23  him and they will ensure that he takes his medications

24  and also keeps his appointments.  That's also

25  important -- he said that's why they're called the

39

Proceedings

1  intensive mobile team, they literally follow him around.

2  And they also have the authority to order him back to the

3  hospital, meaning to contact the NYPD if he's not

4  complying and then ordering him back to the hospital.  So

5  I think there is a mechanism there and also something

6  that would give him an incentive to comply because he

7  doesn't want to be in the hospital and he doesn't want to

8  feel the way he feels when he's off his medication.

9          And one of the things he told me about, there

10  is mention here about what calibration level.  So he said

11  that's one of the ways they can keep track of whether

12  he's on the right amount of medication.

13          THE COURT:  All right.

14          MR. SUNDARAM:  I also think I'm confident that

15  he -- and I think Ms. Azzarelli can probably vouch to

16  this, that these programs or cases, they will keep in

17  touch with Pretrial and let them know so you don't have

18  to rely only on Pretrial.

19          THE COURT:  Let me hear from Pretrial Services

20  on whether you --

21          MR. SUNDARAM:  We also have our social worker.

22          THE COURT:  Yes.

23          MR. SUNDARAM:  (Inaudible).

24          THE COURT:  Right.

25          MR. SUNDARAM:  It's in all of our interests

40

Proceedings

1  that this works.

2          THE COURT:  So I'd like to hear from Pretrial

3  Services to see have you had to interact with these IMT

4  programs before and how effectively can you coordinate

5  any supervision?

6          OFFICER CARTER:  Your Honor, Bianca Carter with

7  Pretrial Services.  I personally haven't dealt with this

8  program.  I've asked the supervisor to walk over.

9          With anything, your Honor, there's always

10  challenges.  We're not a 24 hour, you know, agency.

11  We're only open Monday through Friday.  We are on call on

12  the weekends but we do not do home visits or we're not

13  REACT teams.  So we are at the behest of the type of

14  programming that Mr. Sundaram is referring to as far as

15  ensuring that the defendant is taking his medication and

16  so forth.

17          I know your Honor noted he could take the

18  medication at our office, but at the end of the day we're

19  not a medical facility, so there's always tricks and

20  trades of swallowing the medication but actually cheeking

21  it and so forth.  And like a methadone clinic, we're not

22  open on Saturday and Sunday, so we couldn't ensure that.

23  But if your Honor wants to speak to one of our

24  supervisors who specializes in mental health treatment, I

25  can have him come to court.

41

Proceedings

1          THE COURT:  All right.  Okay.  Well I think

2    what makes sense to me, I would not impose on Pretrial

3    Services the burden of ensuring the health of this

4    defendant.  I think that is too much.  And so a necessary

5    component of any release would be that this IMT program

6    be in place.  And so, you know, and then Pretrial

7    Services would piggy back on that so that they can report

8    to you how he's doing.  And if you in your supervision of

9    the defendant find that he has not been compliant with

10   the conditions that I can impose, then there would be a

11   reason to come back and revisit any release.  But there

12   is this kind of uncertainty about whether the Court will

13   impose this or not.  But the good news I guess is that

14   the hearing's tomorrow.  So what I think makes sense --

15   are there any proposed suretors?

16          MR. SUNDARAM:  As reported in the Pretrial

17   Services report, I think his father, who our paralegal

18   spoke to earlier today, did indicate that he would be

19   willing to sign the bond but he wasn't available today.

20   At this point I don't know, maybe we can get him on the

21   phone.  We can try.

22          THE COURT:  Right.  Okay.  And what kind of

23   work does he do, the father?

24          MR. SUNDARAM:  He is a security guard

25   (inaudible) and an electronic technician.  Between those

42

Proceedings

1   two things it sounds like he makes $75,000 a year.

2           THE COURT:  I see.  Okay.  Hold on.  There's

3   somebody here from Pretrial Services.

4           MS. McTAGUE:  No.

5           THE COURT:  No?  Oh.

6           MS. McTAGUE:  Excuse me, your Honor, I'm sorry,

7   the Pretrial Services report says it's a combined yearly

8   earning of 35,000 to 40,000.

9           MR. SUNDARAM:  I misread it then.

10          THE COURT:  Okay.  That's fine.

11          MR. SUNDARAM:  And your Honor, also Mr. Burgess

12  did tell me just now that he would have no -- you know,

13  this is his choice, that he would have no problem if it's

14  available to him to take a monthly injection of his

15  medication.

16          THE COURT:  Okay.

17          MR. SUNDARAM:  So that's something we can

18  verify through documentation that he took it.

19          THE COURT:  Right.  Okay.

20          MR. SUNDARAM:  (Inaudible).

21          THE COURT:  All right.

22          MS. McTAGUE:  Your Honor, not to belabor a

23  point, I just had information provided to me.

24  Unfortunately, I don't have the specifics, but

25  information that I have is that when the defendant was in

43
Proceedings

1    the Jerome Avenue shelter, excuse me, the Atlantic Avenue

2    shelter, an IMT was in place and he evaded that.

3            THE COURT:  Oh.  Okay.

4            MS. McTAGUE:  And that was part of what put in

5    motion him leaving that facility.

6            THE COURT:  But how is it that they are

7    proposing, the state is proposing an IMT again?  Surely

8    they would know that.

9            MS. McTAGUE:  I don't know, your Honor.  I'm

10   sorry.

11           MR. SUNDARAM:  The assistant outpatient

12   treatment was not ordered.  He did have a caseworker.

13   He's had cases, a cases caseworker over the years.  And I

14   think it's spelled out in the paper in the file that, you

15   know, we're having a court order something that's very

16   specific, it's a high level of treatment.  But yes, he

17   has had a caseworker.

18           THE COURT:  It was an IMT, not an AOT.

19           MR. SUNDARAM:  Right.  An IMT is the component.

20           THE COURT:  Right.  That's what I mean.

21           MR. SUNDARAM:  One of the components.

22           THE COURT:  And it was not ordered by the

23   court.

24           MS. McTAGUE:  I have a clarification.  The IMT

25   was not -- it was part of his probation and that's why he

44

Proceedings

1   was violated because he was evading IMT as it was linked

2   to his probation.

3           THE COURT:  I see.  All right.  So did Pretrial

4   want to be heard?  You're here, so I just wanted to see

5   if you wanted to add anything or did you have any

6   questions?

7           PRETRIAL OFFICER:  Nothing right now, your

8   Honor.

9           THE COURT:  No?

10           PRETRIAL OFFICER:  We don't have any experience

11   with an IMT or AOT.

12           THE COURT:  I see.

13           OFFICER MANGANARO:  So I don't know if I can

14   add anything.

15           THE COURT:  Okay.  That's fine.  Can you just

16   state your name on the record?

17           OFFICER MANGANARO:  It's Brian Manganaro from

18   Pretrial.

19           THE COURT:  Okay.  All right.  Great.  Thank

20   you.

21           So what I think makes sense is given that the

22   mental health professionals are saying that as long as

23   Mr. Burgess takes his medication he can control his

24   behavior and given that the behavior in this case

25   constitutes threats and ordering of bomb materials, which

45

Proceedings

1   is one step removed from causing a clear and present

2   danger to individuals weighing the potential

3   dangerousness to the community under these circumstances,

4   I am willing to allow Mr. Burgess to be released but on

5   condition that he abide by the AOT that may be imposed by

6   the court as a result of the hearing tomorrow.

7          If it is not impose tomorrow, then he needs to

8   come back and we need to have this conversation again.

9   All right?  But I will release him because I think one

10  day and also for him to be able to participate in this

11  hearing and making sure that he's taken his medication

12  today and is at least compliant for this 24 hour gap.  I

13  think I can release him under those circumstances.  I'll

14  impose a $30,000 bond that his father or some other

15  suretor needs to sign, and I'm going to ask for -- Mr.

16  Burgess is not working, right?

17          MR. SUNDARAM:  Not working.

18          THE COURT:  So is he likely to find a job?

19          MR. SUNDARAM:  I think he's indicated that he

20  would be interested in finding work but he doesn't have a

21  job.

22          THE COURT:  Okay.  And then, you know, if his

23  residence is going to be a shelter, I'm just trying to

24  think whether curfew or --

25          THE DEFENDANT:  There is a curfew, 11 o'clock,

46

Proceedings

1   ma'am.

2           THE COURT:  Okay.

3           OFFICER MANGANARO:  So there are some

4   limitations here with shelters.

5           THE COURT:  Yes, that's what I wanted to know.

6           OFFICER MANGANARO:  (Indiscernible).  Most

7   shelters don't allow for them to have location monitoring

8   equipment because there's lack of areas to plug the

9   equipment in and things like that.

10          THE COURT:  I see.

11          OFFICER MANGANARO:  So there's certainly some

12  barriers here particularly not knowing which shelter he's

13  going into tonight.  You know, I don't know if we can

14  confirm anything.  But there are certain barriers.

15          THE COURT:  Right.  So how would you supervise

16  somebody in a shelter?

17          OFFICER MANGANARO:  So with location

18  monitoring, it's pretty difficult.

19          THE COURT:  Yes.

20          OFFICER MANGANARO:  You know, under general

21  supervision you certainly just count on them residing

22  there until they've found something better.  But with the

23  location monitoring condition, if there was a curfew, we

24  might not be able to confirm that he's there.

25          THE COURT:  Yes.  So that's going to be another

47

Proceedings

1  problem, Mr. Sundaram.

2          MR. SUNDARAM:  Your Honor, I've heard of this

3  before but at the same time our office has had clients in

4  shelters who were on the monitor.  So I don't think

5  (inaudible).

6          THE COURT:  All right.  And you told the Court

7  that your client's history is not of leaving shelters.

8          MR. SUNDARAM:  Correct.

9          THE COURT:  It's of going from shelter to

10  shelter.  And the danger that the government has

11  presented is the ordering of materials to make a bomb and

12  making threats via remote means.  I mean my fear is that

13  your client will show up at the doorstep of one of these

14  individuals.  And so how do we guard against that?  I can

15  order that he stay away from them for sure but I don't

16  know that we have a way to monitor it.  So that is

17  another level of concern.

18          MS. McTAGUE:  But I would note that there's no

19  allegation that he's ever done such a thing.  And he had

20  the ability to do so for several months.

21          THE COURT:  Yes.

22          OFFICER MANGANARO:  Based on the seriousness of

23  the charges, I'd highly recommend that at least we have

24  some sort of confirmation of where is it he's going to

25  go, some sort of confirmation that we are going to be

48

Proceedings

1  able to have location monitoring equipment placed there

2  at least in the time being until something more permanent

3  can be arranged for him.  With not those things in place,

4  we certainly have our concerns about the seriousness.

5          THE COURT:  Yes.  And are there shelters where

6  location monitoring could be used.

7          OFFICER MANGANARO:  Well we've certainly had

8  experience with shelters that do accommodate such

9  requests.  You know, again, not knowing where that place

10  is, it's going to be hard to confirm that right now.

11          THE COURT:  So that would have to be one of the

12  conditions that wherever he is placed shelter wise will

13  allow there to be location monitoring.

14          OFFICER MANGANARO:  Especially if there's a

15  curfew or a home detention provision where --

16          THE COURT:  Exactly.

17          OFFICER MANGANARO:  -- you know, we'd be able

18  to monitor that he is where he's supposed to be.

19          THE COURT:  Right.  Okay.

20          MR. SUNDARAM:  Your Honor, I think if I

21  understand correctly, the concern that we're talking

22  about is to be able to monitor his whereabouts with the

23  location monitoring.  So we have had -- there are

24  shelters that will allow that.  However, all the

25  shelters -- the shelters don't allow their residents to

49

Proceedings

1  stay in the shelter all the time.  So they make them

2  leave and then they have to be back by the curfew time.

3  So we would hope that it would be location monitoring but

4  with a curfew or just whatever the shelter imposes and

5  not confinement in the shelter at all times.

6          THE COURT:  Right.  So I understand that home

7  detention would not work but then there would have to be

8  an agreement as to where he's going when he's not allowed

9  to be in the shelter itself.  And I'd don't know if you

10  have any thoughts on where he can go when he's not in the

11  shelter other than wandering around the streets.

12          MR. SUNDARAM:  Just to clarify.  They're not

13  required to leave the physical vicinity of the shelter.

14  They just can't stay in their dorm, in their room.

15          THE COURT:  Okay.

16          MR. SUNDARAM:  So there would be outdoor space

17  or common areas where they can go.  And in his case, I

18  think he will have numerous appointments that he has to

19  have, you know, probably several times a week to comply

20  with the AOT.

21          THE COURT:  Okay.  So I think we can make that

22  work to have him have location -- he has to be in a

23  shelter where he can have location monitoring because I'm

24  going to impose location monitoring as a condition.  So

25  if we can't make that work, then he can't be released.

50

Proceedings

1    All right?  I mean I'll release him and I'll give a

2    period of time for all of these things to be worked out.

3    And does it make sense to have a curfew or just leave the

4    location restrictions up to Pretrial Services?

5              OFFICER MANGANARO:  So the issue with the

6    curfew is technically between the hours that he's allowed

7    out he could essentially go wherever he wants.  There

8    would be no restrictions on the location other than his

9    general travel restrictions.  You know, with more

10   specific direction like a home detention condition, he

11   would certainly be allowed out for any verified

12   appointments that he'd have to go to.  But other than

13   that, he'd be expected I guess to stay on the grounds of

14   the shelter.

15             THE COURT:  Right.  Okay.  So I think actually

16   that makes sense because then the medical appointments

17   and things like that wouldn't need to be confirmed with

18   Pretrial Services.  If there are specific times he's

19   meeting with doctors or other healthcare professionals as

20   part of the AOT or whatever else it is, that schedule

21   needs to be given to Pretrial Services so they can

22   confirm that that's where he's going.  And other times he

23   needs to stay within the shelter and hopefully it's a

24   situation where the shelter allows people to stay within

25   the shelter even if it's not in his particular room.

51

Proceedings

1   Right?  So you need to find a situation that permits that
2   to happen and still allows him to go get the treatment
3   that he needs because the treatment will also be part of
4   one of his conditions.  So let me just see if I can write
5   this out so it makes sense.
6           So the AOT is assisted outpatient treatment
7   plan.  Right?  And there are a lot of contingencies here,
8   Mr. Sundaram and given what you're telling me is a high
9   probability that these things will happen, I will allow
10  Mr. Burgess to be released today but he must comply with
11  all of these things in a short period of time.  So if I
12  say by the end of this week, so I'll say by Friday he
13  needs to have worked all of these things out because if
14  by Friday there is no assisted outpatient treatment plan
15  in place or he's not in a shelter that allows him to have
16  location monitoring, or the shelter has such restrictive
17  conditions that he's not allowed to stay on the grounds
18  during the day, or his father refuses to come in and act
19  as a suretor, then his conditions -- then it's not in
20  compliance with the release order that I'm signing and
21  then he needs to be brought back, your client needs to be
22  brought back in so we can reevaluate what's going to
23  happen.
24          MR. SUNDARAM:  Well, I'll actually be on
25  arraignment duty again on Thursday.

52

                    Proceedings

1          THE COURT:  I'm sorry?

2          MR. SUNDARAM:  I'll be on arraignment duty

3  again this Thursday.

4          THE COURT:  All right.

5          MR. SUNDARAM:  So I'll do everything I can to

6  see if we can get those things in place.  I'll be here to

7  report to the Court.

8          THE COURT:  Thursday would be even better

9  but --

10          MR. SUNDARAM:  But I mean I'd like if you gave

11  us to Friday --

12          THE COURT:  Okay,

13          MR. SUNDARAM:  -- just because it might take a

14  little longer time.

15          THE COURT:  Okay.  So then I'll order you to

16  file a report with the Court or be here with your client

17  to tell me what's going on.  And if everything is going

18  great, then he can stay on release.  But if there are

19  problems with any of these issues, then we need to figure

20  this out and think some more about what's going to

21  happen.  Okay.  Because I do think these are serious

22  allegations but I think that we can craft these release

23  conditions with the assistance of the health

24  professionals who hopefully will be available to make

25  this happen.  But if they're not available to make this

53

Proceedings

1   happen or if the shelter system is not providing what

2   they need to, their component to make this happen, then I

3   will have concerns about whether these are adequate

4   conditions to ensure the safety of the community and

5   these victims.

6          MR. SUNDARAM:  I guess one condition I would

7   ask the Court to consider holding off pending his

8   placement in a shelter is the home detention condition

9   because I think that if you order that he not go anywhere

10  near where any of the Jane Does in the complaint live, I

11  think a curfew as set by Pretrial I think would be much

12  better in terms of allowing him to go through all of the

13  different treatments because otherwise he has to keep

14  making requests every time.  And I think sometimes that

15  becomes difficult because they need a certain amount of

16  notice and I don't know if he's going to have the same

17  schedule every week.  And I don't see any reason to say

18  he can't go anywhere.  We can just confine him to New

19  York City and with a curfew set by Pretrial.

20         THE COURT:  Well, these are things I would like

21  to know by Thursday what is happening.

22         MR. SUNDARAM:  Okay.

23         THE COURT:  Yes?

24         OFFICER CARTER:  Your Honor, I just want to

25  clarify.

54

Proceedings

1          THE COURT:  Okay.

2          OFFICER CARTER:  Pretrial Services understands

3    counsel's statement but we would like still home

4    detention at least until Friday so that we can see if the

5    defendant even is going to comply with the bare minimum

6    of conditions.  We don't want to reward big behavior

7    especially when we're recommending detention at this

8    time.

9          THE COURT:  Right.

10          OFFICER CARTER:  Right off the gate, these are

11   serious allegations and we would like a short leash so to

12   speak rather than giving him a lot of rope to get himself

13   into trouble.  So if your Honor wants to change his

14   conditions as far as a curfew instead of home detention

15   on Friday, that is definitely your right.  We would just

16   personally ask at least for your Honor to reconsider on

17   Friday once everything is put into motion so that we can

18   assure that everything is good.

19          THE COURT:  Okay.  And I guess how would I

20   phrase that if it's not clear that he is a shelter where

21   he can have the location monitoring?

22          OFFICER CARTER:  You can still place home

23   detention, your Honor.

24          THE COURT:  That's true.  But you just can't

25   check on it.

55

Proceedings

1          OFFICER CARTER:  However, on Friday or when
2    your Honor sees the defendant again, you can modify the
3    bail conditions --
4          THE COURT:  I see.
5          OFFICER CARTER:  -- to a curfew if you see fit.
6          THE COURT:  Okay.  All right.  So let's do
7    that.  So the condition will be home detention and the
8    home will be the shelter that he's being placed in.  And
9    the shelter needs to allow location monitoring.  The
10   location monitoring, it's not going to happen right away
11   but it's going to happen as soon as Pretrial Services --
12         OFFICER CARTER:  I will place the bracelet on
13   today, your Honor.
14         THE COURT:  Oh, today.  Okay.  So there you go.
15   Okay.  So we can do that.  All right.  Is that clear?
16         So all of these things need to happen and I
17   would like to see you on Thursday just to make sure
18   everything is in place.  And that will give me assurance.
19   I'll be on duty on Thursday afternoon starting in the
20   afternoon.  So we can schedule something.  Should we do
21   that?  Say 2 o'clock on Thursday?  You said you were
22   on -- no?
23         MR. SUNDARAM:  Yes, that's fine.  Yes, I'll
24   report to --
25         THE COURT:  But you're not on duty on Friday,

56

Proceedings

1  Mr. Sundaram?

2          MR. SUNDARAM:  No, I'm not going to actually

3  be -- I'm going to be out of town Friday.  I have parents

4  visiting so I have to leave Friday morning.  But I can

5  report to the Court Thursday afternoon and then if we

6  need any follow-up on Friday, I'll have whoever's on duty

7  deal with it on Friday.

8          THE COURT:  Okay.  So it can be a short report,

9  Michelle.  So let's just try to squeeze it in even if --

10          THE CLERK:  Friday?

11          THE COURT:  On Thursday.

12          THE CLERK:  Thursday at 11.

13          THE COURT:  Judge Levy is on duty in the

14  morning.  So can we just do it right at 2 o'clock?  I'll

15  make it hopefully a ten minute or 15 minute --

16          THE CLERK:  Okay.

17          THE COURT:  Okay?  All right.  So I'm going to

18  say -- so here's what I'm going to do.  I'm going to

19  release Mr. Burgess today on a $30,000 bond.  All right?

20  He needs to get into a shelter with the assistance of the

21  Federal Defenders tonight.  He's going to have location

22  monitoring tonight.  He's going to be on home detention

23  immediately.  Tomorrow he will participate in a hearing

24  and Mr. Sundaram, you'll be on top of this so you know

25  exactly what's happening and what the plan is from the

57

Proceedings

1    state court.  Assuming that the AOT is ordered, there

2    needs to be coordination with Pretrial Services so they

3    know kind of what the situation is there and if he has

4    medical appointments and things like that because they'll

5    be doing their location monitoring.

6           There should be no reason for Mr. Burgess to be

7    leaving the shelter which will be his residence for

8    anything other than the court appearances, treatment,

9    meeting with the AOT health professionals.  Those are

10   basically it.  Or unless he speaks with Pretrial Services

11   for specific reasons that he needs to go anywhere.

12          He must stay away from the victims, the three

13   Jane Does.  No communication electronically, certainly

14   know in-person visits and no telephone calls.  So if

15   there's any attempt to contact any of these three women,

16   that will be a violation automatically of your conditions

17   of release.  So no contact with those people.  All right?

18   Yes, Mr. Sundaram?

19          MR. SUNDARAM:  (Inaudible).

20          THE COURT:  Oh, okay.

21               (Pause in proceedings)

22          MR. SUNDARAM:  Your Honor, since his hearing is

23   tomorrow morning by video conference and the agents have

24   his phone and my understanding is they're planning to

25   hold onto it for now as arrest evidence and it's not

58

Proceedings

1   physically here, I would ask if Mr. Burgess could come to
2   my office, be there tomorrow morning by 10 o'clock in the
3   morning so that we could put him on the video.  I think
4   the hearing can go on without him but he'd like to
5   attend.
6          THE COURT:  Yes.
7          MR. SUNDARAM:  And that way we may also be able
8   to just to talk to him and --
9          THE COURT:  Yes.  And I'll count that as a
10  visit with the attorney because he'll be in your office.
11  All right?  So that would be fine.
12          So and then the other conditions, I'd like his
13  father or some other suretor, acceptable suretor, to sign
14  by Friday.  So are there any questions about the
15  conditions --
16          MR. SUNDARAM:  No.
17          THE COURT:  -- and what needs to happen?  All
18  right.  So Mr. Burgess, do you have any questions about
19  your conditions of release?
20          THE DEFENDANT:  No, ma'am.
21          THE COURT:  All right.  Let me add also that
22  you may not commit any crimes while you are on release.
23          THE DEFENDANT:  Yes, ma'am.
24          THE COURT:  You may not possess any explosive
25  devices or components to make explosive devices.

Proceedings

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  And you must show up for all your

3   court appearances.

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  All right?  So no possession of

6   firearms, no possession of explosives, bomb making

7   materials, any of that.

8          THE DEFENDANT:  By federal law, ma'am, I'm

9   special need, I can't have that anyway.

10         THE COURT:  I'm sorry?  I can't hear you but I

11  also want Mr. Sundaram to -- your client wanted to say

12  something.

13                (Pause in proceedings)

14         THE COURT:  Mr. Sundaram, what did your client

15  want to say?

16         MR. SUNDARAM:  I think he exhibited some

17  knowledge that he's a prohibited person under federal law

18  so he couldn't have whatever he --

19         THE CLERK:  Explosive device.

20         MR. SUNDARAM:  Yeah.

21         THE COURT:  Okay.  So Mr. Burgess, this is very

22  serious.

23         THE DEFENDANT:  I understand.

24         THE COURT:  All right?  What you're charged

25  with is very serious.

60

Proceedings

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Your trial has not yet happened so

3   you still need to face the allegations against you.

4          THE DEFENDANT:  I understand.

5          THE COURT:  All right?  And I know you have

6   some mental health challenges and I know you're taking

7   medication.  The doctors are telling us that as long as

8   you take your medication you can control things.

9   Assuming that the behavior that you're being charged with

10  is because of your mental health challenges -- it may not

11  be.  We don't know that.  But because of what has been

12  presented to me, I'm willing to take a chance on you.

13  But it's really up to you whether you stay out in the

14  community even if it's in a shelter or you go to MDC

15  where you're not going to get the treatment that you

16  need.  And it's not a pleasant place to be.

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  All right?  So your goal is to

19  avoid going to MDC.  And the way you do that is you take

20  all your medication as you're supposed to.

21          THE DEFENDANT:  Yes.

22          THE COURT:  Even if you hate doing it, you have

23  to do it.

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  And you have to listen to what the

61

Proceedings

1   doctors tell you in terms of your treatment.

2              THE DEFENDANT:  Yes.

3              THE COURT:  And you have to be where you're

4   supposed to be and not go where you're not supposed to

5   be.

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  All right?

8              THE DEFENDANT:  Yes, ma'am.

9              THE COURT:  So there'll be people helping you

10  but ultimately it's up to you.  If you mess up on any of

11  these things, all right, and the Court finds out, and

12  we're going to be monitoring you so it's pretty clear

13  that we will find out what you're doing --

14             THE DEFENDANT:  Yes, ma'am.

15             THE COURT:  -- then there's a very high

16  likelihood you're just going to end up at MDC.

17  Understand?

18             THE DEFENDANT:  Yes, ma'am.

19             THE COURT:  All right.  So I want you to take

20  this seriously and I want you to understand the

21  consequences.  I'm also asking your father to step in as

22  a suretor because he'll be an extra set of eyes on you

23  and he can talk to you to convince you when you think

24  that it might not be serious enough for you to pay

25  attention.  All right?  And he's going to put his money

62

Proceedings

1   on the line because I'm going to ask him to sign a

2   $30,000 bond.  So if you don't comply with all your

3   conditions, you go to jail and your father pays $30,000.

4   I'm sure you don't want that to happen.

5          THE DEFENDANT:  I don't, ma'am.

6          THE COURT:  All right.

7          THE DEFENDANT:  Thank you.

8          THE COURT:  Do you know what you're supposed to

9   do?

10          THE DEFENDANT:  Yes.  Follow the conditions and

11   take my medication, listen to the doctors.  Whatever I

12   have to do, I go to with permission from the Court.

13          THE COURT:  All right.  And listen to Pretrial

14   Services.  I know you've had some problems with probation

15   in the past.  I don't know what those were.  Going

16   forward you need to pay attention to the Pretrial

17   Services folks.  And if I hear from them that you're not

18   complying or you're not taking things seriously, that

19   could be problems for you.

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  All right.

22          THE DEFENDANT:  I understand.

23          THE COURT:  Okay.  So I'm going to give you

24   this to sign.  Actually, I just want to add the suretor

25   by Friday.

63

Proceedings

1          (Pause in proceedings)

2          THE COURT:  All right.  So I'm going to have

3  the next court appearance be Thursday at 2 o'clock here

4  and I'd like to hear what's going on at that point.  All

5  right?  And Mr. Burgess, you need to be here so that I

6  can check in and see how things are going.

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  All right.  Thank you.

9          THE CLERK:  Thanks, everyone.

10          (Matter concluded)

11                    -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **12th** day of **October**, 2022.


*Mary Greco*

Transcriptions Plus II, Inc.